SYLPH. The (BRADSHAW v.). See Case No. 1.791.

SYLPH. The (WILLIAMS v.). See Case No. 17,740.

SYLVAN SHORE. The (CONCKLIN v.). See Case No. 2,090.

# Case No. 13,712.

## The SYLVESTER HALE.

[6 Ben. 523; 17 Int. Rev. Rec. 196.] [1]

District Court, E. D. New York. May 12, 1873.

COLLISION—LONG ISLAND SOUND—SCHOONERS MEETING—PORTING HELM.

1. Two schooners came in collision in Long Island Sound in a clear night. They were sailing on meeting courses, not varying more than half a point from being exactly opposite courses. Both vessels had the wind free. Neither made any change of course before the collision. *Held*, that the case was one for the application of the eleventh of the rules for avoiding collisions. That both vessels were, therefore, bound to have ported their helms, and, as neither had done so, both vessels were in fault, and the damages must be apportioned.

[Cited in The Decatur H. Miller, 10 C. C. A. 284, 62 Fed. 95.]

2. Whether the eleventh rule is applicable to the case of two sailing vessels meeting end on or nearly so, one being close hauled and the other sailing free queere.

[Cited in The Manitoba, Case No. 9,029.]

In admiralty.

Wilcox & Hobbs, for libellant.

Evarts, Southmayd & Choate, for claimants.

BENEDICT, District Judge. This action is brought to recover the value of the schooner G. R. Murney, a vessel owned and commanded by the libellant, John Murney, which was sunk on the night of the 20th of July, 1872, by colliding with the schooner Sylvester Hale in Long Island Sound. The Murney was a canal schooner laden with coal, upon a voyage from Elizabethport. N. J., to Norwich, Conn. The Hale was a schooner bound from Taunton to Elizabethport light. The Murney was going four or five, the Hale six or seven miles an hour under a good sailing breeze. The night was clear and nearly as light as day.

The libel gives the course of the Murney as east northeast half east, with the wind due north, but claims that she was close hauled and held her course. It charges that the Hale was sailing free, and that, although bound to avoid the Murney, she did nothing, but held her course, and thereby ran into the Murney, striking her upon her lee bow and causing her to sink almost immediately.

The answer presents features calculated to

1 [Reported by Robert D. Benedict, Esq., and here reprinted by permission. 17 Int. Rev. Rec. 196, contains only a partial report.]

attract attention. It states that the Murney was sailing free, and the Hale close hauled, but also states that the course of the Hale was due west, with the wind north northwest, which makes the Hale free. It states that the Murney appeared to those on the Hale to be bound to the eastward, and upon a course which would have carried her to the southward of the Hale; but the men on the Hale swear that the Murney was taken for a vessel bound to the westward—a statement not always adhered to however by the man at her wheel. The answer also in unequivocal terms states a case of vessels not meeting end on or nearly so, while the argument addressed to me in behalf of the Hale was largely based upon the theory, that the vessels were so meeting Finally the wrong movement charged upon the Murney in the answer is starboarding, but the movement is there so described, as to show that faulty navigation in allowing the vessels to get into such close proximity, and not any starboarding by the Murney, must have been the cause of the accident.

The testimony offered in support of these pleadings respectively abounds in inexplicable statements, and contradictions which it is vain to attempt to reconcile. A prominent statement is that those on the deck of the Hale were keeping a good lookout, and saw the Murney at a distance to leeward. When the evidence of the two persons who were on the deck of the Hale, as to what they did on board their vessel, is examined, the fact appears that they kept no proper lookout, did not see the Murney, until the instant of collision, and made no change in the helm of the Hale in time to alter her course before the vessels came in contact. This controlling fact is disclosed by the following evidence given by the witnesses for the Hale. The mate was in charge of her deck, and the supposed lookout. He says that he saw a schooner approaching to windward, and at once went aft to the wheel, and inquired of Petersen, the man at the wheel, if he saw her; that when aft he looked at the compass, as was natural, and found the vessel to be sailing west by south, the course which had been given to the wheelsman. He mentions no change in the helm, as being then made, and he directed none; but, having looked at the compass, he started forward, and when he arrived at the mainmast stopped to give the winch two or three turns, just enough to taughten the topsail sheet. From the winch he moved towards the steps, to windward, and he had gone but a few feet when the vessels came in contact.

All that was done on board the Hale, with reference to the Murney, transpired during the very short period of time which elapsed between the mate's leaving the wheel and the blow. Petersen, the man at the wheel, says that during this period he looked under his boom twice; that the mate had not reported, nor had he seen the Murney till he first look-

ed under the boom, after the mate left him to go to the winch; that when he first looked, he saw the Murney two points off. his bow, but did nothing; that the second time he looked she was still two points off his bow on the same course, but very near him, and that he at once ported his wheel. It is impossible that the Murney should have then been two points off his bow. His statement that. as he stood to leeward on his vessel to look under his boom, he saw the Murney through the parts of the fore-rigging, is more likely to be accurate, and places her nearly ahead and up-on him, as the fact was. I conclude, with-out difficulty, from this evidence, that the Murney was not seen from the Hale, until the instant before the collision, and when no ac-tion of the helm could effect any useful change of course.

While considering the testimony of the per-sons on the deck of the Hale, I may here re-mark that the mate says, that he saw and re-ported the Murney to the man at the wheel before he went to the winch, but the state-ment is contradicted by the statement of the latter and by the action of both; and that the man at the wheel says that he supposed the Murney to be going the same way the Hale was, but the statement is wholly inconsistent with other parts of his testimony and with his acts. These and other misstatements, which appear in the evidence of those responsible for the movements of the Hale, make it diffi-cult to place great reliance upon any of their statements or conclusions. Their own ac-count of what they did contradicts their theory of the case, and shows them guilty of the great negligence of running in the night with-out keeping a proper lookout, and that they made no change of course to avoid the Mur-ney.

Having thus ascertained the movements of the Hale with reference to the Murney, I turn to consider the movements of the Murney. Upon this point, the testimony of those on the Hale throws no light, for they did not see her till she was upon them. Those on the deck of the Murney say that they had a look-out, who saw the Hale for a long distance. In order to disprove this, evidence has been given tending to show that the man claiming to be the Murney's lookout came on board the Hale in a condition, as to his dress, which indicates that he had been roused from his berth by the collision. Upon a careful exami-nation of the testimony of the various wit-nesses on this point, the weight is found to favor the allegations of the Murney that she had a lookout and saw the Hale in time.

The actual management of the Murney is indeed more consistent with the idea that the Murney was being sailed without knowledge of the presence of the Hale, until the vessels were close together, than with any other; but it is also consistent with the theory that the Hale was seen and, under the supposition that she was more free than the Murney, it was judged that, if the Murney held her course, the Hale would feel forced to keep out of the way—a result which doubtless would have been attained if any one on the Hale had been looking at the approach of the Murney. But whether the Hale was seen or not, there is no evidence of any change in the course of the Murney prior to the time when the ves-sels were close together and the collision in-evitable.

It thus appearing that no changes occurred in the courses of the vessels calculated to cause the collision, next in order is to deter-mine what the courses were upon which these vessels were thus sailing. As claimed by the respective crews, and as proved by the evi-dence, the course of the Murney was E. N. E. ½ E., and that of the Hale W. by S. Their divergence was, therefore, half a point. By holding these courses, the vessels came in contact, and it must, therefore, be found that the speed at which these vessels were going respectively was such that the courses they were upon involved risk of collision. The question then arises whether they were cross-ing, within the meaning of rule 12 of the in-ternational rules adopted by the United States in 1868, or meeting end on or nearly so, with-in the meaning of rule 11.

This brings up for consideration the proper construction to be given to rule 11 of the in-ternational rules, a rule which has been often called in question, and, as it appears to me, greatly liable to be misapplied. The prac-ticability of this rule at all in the actual navi-gation of sailing ships has been, and still is, in some quarters doubted, and at its door have been laid many disastrous collisions, for "the reckless use of port-helm leads to collision."

Perhaps the better opinion now is, that the rule is practicable, provided its application be carefully restricted to the cases to which alone its terms make it applicable. As is well known, the rule originated in England, and stands there as a substitute for a rule differently worded, which was found to be impracticable, and, accordingly, was sub-stantially destroyed by judicial decisions. Lown. Col. p. 22. As at first understood, the rule, in its present form, was greatly criti-cised, and was defended by claiming it to read as not applicable to ships which must, if both keep on their respective courses, pass clear of each other; but applicable, in the night time, only to cases in which each ship is in such a position as to see both the side lights of the other. This was the con-struction given by Mr. Thomas Gray, of the British board of trade, and it was approved, in England, by the admiralty, board of trade, and Trinity House, and, in France, by the French government.

By the order in council of July 30, 1868, it became part of the law in England. It was adopted as a supplement to the international rules by the assembly of the senate, at Ham-burg, October 16, 1868. This interpretation

was adopted by Russia, by order of the emperor, November, 1868. and by Sweden, December 12, 1868.

(See appendix to "A Few Remarks Respecting the Rule of the Road for Steamships," by Thomas Gray, for the words of the order.)

The paramount importance of having international rules, which are intended to become part of the law of nations, understood alike by all maritime powers, is manifest; and the adoption of any reasonable construction of them, by the maritime powers named, affords sufficient ground for the adoption of a similar construction of our statute by the courts of this country.

For this reason, and because the rule, so understood, will seldom come into play, and, therefore, affect but little the old maritime rules of the seas, which were followed for centuries before the rules, and which are, for the most part, still followed by seamen in the actual navigation of sailing ships, I so construe the rule. But, so understood, it is, nevertheless, applicable here, for the evidence shows the present to be what has been called "the exceptional case,"—the case "hardly determined by the rules," of two sailing vessels meeting, in such a position that each should have seen both the side lights of the other.

I do not overlook the testimony of those on the Murney, that only the green light of the Hale was seen by them, nor the claim of the Hale that only the red light of the Murney was visible to her. But the observation of the Murney by those on the Hale was when danger was imminent, and is not reliable. And, on the other side, the captain of the Murney, who was at her wheel, reconciles his statement that he saw only the green light of the Hale, with the mode in which the vessels were approaching, by the not improbable supposition that the red light of the Hale was hid by her jib. Other facts in the case, and, among them, the nature of the injury upon the starboard bow of the Hale, and the mode in which the blow was delivered, indicate that the vessels were meeting almost exactly end on, and such is the description of the collision as given by the libel.

At this stage of my examination of this case I am brought very near to a question respecting the application of rule 11, of so much importance that, although not called on by the facts of this case to decide it, I do not feel at liberty to allow it to pass without allusion. That question is whether rule 11 is to be considered as subject to the ancient and most universal law of the sea, that a vessel sailing free shall give way to a vessel sailing close-hauled. As worded, the rule contains no exception unless it may be found in the phrase, "so that each may pass on the port side of the other." These words seem to indicate that the rule is only applicable to vessels which have the wind alike, inasmuch as a vessel close-hauled upon the starboard tack, if she ports, will necessarily come into the wind and her way be stopped; therefore if she ports she cannot be said to pass the other at all. Instead of passing she makes herself a stationary object to be avoided by all approaching vessels. The provisions of rules 19 and 20 may also be resorted to, as affording ground for the conclusion that a vessel sailing close-hauled is exempted from the obligation to port. Aside from the wording of the rules, it has been urged that they must be so construed as to be reasonable, and that it is unreasonable to require a vessel to throw herself out of command, or to compel her to work her sails or to run off to leeward, to avoid a vessel which by a movement of her helm can go either way without loss of position.

This consideration was doubtless the ground of the decision of Dr. Lushington in the case of The Halcyon, Lush. 101, where, notwithstanding the statutory rules, a vessel sailing close-hauled upon the starboard tack was held not bound to port. Similar considerations would seem to have force in the case of a vessel close-hauled upon the port tack, for, although a vessel close-hauled on the port tack can port without losing her headway, she cannot do so without making distance to leeward which she must beat to windward to overcome. She can run off with ease, but she cannot regain her original line without tacking. If, without tacking, she resumes her course by the wind, she must do so upon a line parallel to, but to leeward of her original course, to her great disadvantage. The necessary result of porting by a vessel close-hauled upon the port tack is so disadvantageous that it has been said by good authority, that in all ordinary cases a vessel so situated will come into the wind and stop in preference to keeping off. See "The Law of the Port-Helm—An Examination into Its History and Dangerous Action," by Commanders P. H. Colomb and H. W. Brent, H. B. M. Navy, largely quoted in the collation made by Commodore Jenkins, U. S. navy, and published by the navy department in 1819 (page 164). Furthermore, the sailing rules were supposed to be intended to make definite, but not to change, any of the sailing rules known and practiced by seamen everywhere; and it will be found, I think, that such has been the interpretation, in the particular now in question, which has been given to the rules by those whose peculiar business it is to apply them in actual navigation. If this should prove true, any attempt by the courts to adopt a construction at war with the traditions of the sea, and not adapted to the necessities of sailing ships, would, as I fear, prove much worse than useless.

These considerations affecting the construction of rule 11, I have thought proper to state when examining the rule, although I am not now called on to determine as to

their validity, for the reason that upon the evidence in this case I deem it quite clear that neither of the vessels in question was close-hauled. As to the Hale, her own crew say she was sailing free. As to the Murney, her libel, and her master upon the stand, make her half a point free, if the wind was north, and his vessel only able to lie within six points, as he claims, but which is doubted. She was a point and a half free if the wind was N. N. W., as is claimed by the Hale to have been shown. But half a point would have enabled the Murney to port sufficiently to avoid the Hale and still regain her distance to windward, and removes from her any ground of exemption from the obligation to port. Both of these vessels were, therefore, bound to port as they approached each other, unless excused by some peculiar circumstance. This neither did. The libel of the Murney avers that she did not, and the answer avers that the Hale did not. For this omission the evidence furnishes no excuse. In the libel an excuse is suggested for the Murney that the actions of the Hale led the master of the Murney to suppose that the Hale was going to keep off, but there is nothing in the evidence to countenance the suggestion. The answer states, in excuse of the omission by the Hale, that a vessel was to windward of the Murney, and sailing so near to her course, that it was not safe or proper for the Hale to port. But the Hale had abundant time, after these schooners were in plain sight, to have gone to windward of both of them, and she could have done it easily by a movement in time. Nor were the approaching schooners so near together as to prevent her at a subsequent period from luffing sufficiently to clear the Murney and passing between them, without danger of collision with the windward schooner. In fact, the man at her wheel swears that he did luff half a point, but as already shown, all that this man did was done at the instant of collision, when it is doubtful if any movement of his wheel could have any effect upon his course, or did any more than to transfer the blow from the side of the Murney to her bow.

This case, restated then as I find it, is that of two vessels meeting in a clear night end on, both free and each able to port so as to avoid the other. The one bound to the westward runs into the bows of the other without attempting to avoid her, and in fact without seeing her at all, owing to the want of lookout. The one bound to the eastward, and equally bound to port, if she saw the other at all, made no change of course, gave no hail whatever, but held on until her bows were stove by the collision. Both without excuse neglected to obey rule 11, which, if it had been obeyed by either, would have prevented the accident; and both vessels being in fault, the damages resulting must be apportioned.

Let a decree be entered accordingly.